THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TAMMY JO McGEORGE, Defendant-Appellant.

Fourth District   No. 4—86—0332

Opinion filed June 22, 1987.

862

Glenn A. Stanko, of Reno, O'Byrne & Kepley, P.C., of Champaign, for appellant.

Jeffrey K. Davison, State's Attorney, of Decatur (Kenneth R. Boyle, Robert J. Biderman, and Michael Blazicek, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE SPITZ delivered the opinion of the court:

The defendant, Tammy Jo McGeorge, was charged by information with eight counts of obscenity, a Class A misdemeanor (Ill. Rev. Stat. 1983, ch. 38, par. 11-20). Counts I through IV alleged, *seriatim*, possession of two obscene magazines and two obscene books with the intent to disseminate them. Counts V though VIII alleged, *seriatim*, the sale of two other obscene magazines and two additional obscene books. Each count alleged that the defendant had knowledge of the nature or contents of the materials or recklessly failed to exercise reasonable inspection which would have disclosed the nature or contents of the materials.

Defendant filed a pretrial motion to dismiss, asserting that the Illinois obscenity statute unconstitutionally violated her rights under the first and fourteenth amendments. The motion to dismiss was denied by the trial court. A jury trial was conducted in this cause on April 21 and 22, 1986.

At the trial, Clifford Kretsinger, a police officer for the city of Decatur, testified that on October 28, 1985, he went to an adult bookstore at 145 North Main Street, Decatur, Illinois. He had been directed to go to the store by his superior to look for "bondage" material. The exterior of the bookstore was labeled as an adult bookstore and one could not see into the interior from the outside.

Kretsinger testified that as he entered the store, the defendant,

who was behind the counter, advised him that there was a 50-cent charge to enter the store, which would be refunded upon a purchase. After the defendant collected the fee, Kretsinger entered the main sales area, which contained racks of books and magazines appearing to be of a sexual nature, and began looking through the books. Kretsinger picked up a book entitled She-Male Sadist, opened it to a photographic illustration on page 71, and showed it to defendant at the counter. Kretsinger asked the defendant if they had any other books or magazines "with any better pictures, maybe something in color." The defendant responded by saying that she did not know what was in the books because she did not look at them and suggested that he look himself.

Kretsinger further testified that he proceeded to select another book, Slave Sisters, and two magazines, Chair Bondage and Climaxed by Pain, and took them to the sales counter where the defendant was seated. Kretsinger purchased the magazines from a male behind the counter who rang up the items and bagged them for him.

On cross-examination, Officer Kretsinger acknowledged that he was not directed to the particular materials by anyone; he was not assisted in picking out the materials by anyone, but was free to select for himself; and he was free to choose from virtually hundreds of items in the store, including any number of bondage books or magazines.

David Barringer, another city of Decatur police officer, testified that later that day upon similar instructions from his superior, he also went to the adult bookstore at 145 North Main Street, Decatur, Illinois. Barringer confirmed that the store was labeled as an adult bookstore and also believed that signs required a person to be 18 years old or older to enter. Barringer further testified that there were racks of books and magazines in the store of a sexual nature. Barringer testified that after he entered the store, the defendant entered and went behind the counter. Barringer picked up a book entitled Bizarre, Master of Pain, opened it to a picture on page 165, approached the counter, and showed it to the defendant. When Barringer asked the defendant if she had any films of this type in the store, she responded negatively. When Barringer then asked if they had any magazines similar to the books, the defendant said "Yes," pointing to a rack in front of a wall. Barringer testified that the defendant said all of the bondage books were located over there.

Barringer went to the area indicated by defendant and selected two magazines, John Savage's Notebook and Asses in Bondage. He also selected another book entitled Bizarre, Daughters of Darkness

from the area where he had originally obtained the first book. According to Barringer, there were about 100 books of that type in the same area.

Barringer took the selected materials to the counter where defendant was located. Defendant asked if he was affiliated with any law-enforcement agency. Barringer told her that he was not, and asked if he would get a discount if he was. The defendant responded negatively. Barringer gave the money for the materials to the defendant and she gave him a receipt and bagged them.

On cross-examination, Barringer also acknowledged that no one had directed him to a particular book or magazine and that he could have selected from hundreds of different books or magazines in the store, including those with a bondage theme.

The defendant's oral motion for a directed verdict at the close of the State's case in chief was granted in part and denied in part. A directed verdict was granted on count I (Chair Bondage), count II (Climaxed by Pain), and Count III (Slave Sisters), leaving count IV (She-Male Sadist) as the only remaining count alleging possession of obscene materials with intent to disseminate; however, the motion to dismiss counts V through VIII, alleging possession with intent to disseminate, was denied. Included in the defendant's case in chief were certified copies of adult use ordinances from eight cities in the State of Illinois (Urbana, Bloomington, Springfield, Danville, Chicago, Galesburg, Quincy, Peoria), all of which allowed for adult uses in specified areas.

Dr. Roderick Bell, a social scientist with a Ph.D., testified on behalf of the defendant as an expert witness regarding a public opinion poll designed to sample and report the attitudes of adults living within the State of Illinois regarding the depiction of sexually explicit materials. Dr. Bell's poll was taken in August and September of 1985 and was based on a random telephone sampling of 800 individuals. A "Summary of Responses" was admitted into evidence as defendant's exhibit No. 16. The following is an excerpt from that "Summary."

"In your opinion is it now all right or not all right in the State of Illinois for ***.

12. Movie theaters and bookstores that restrict attendance to adults only to show depictions of bondage?

|  | N | % |
|---|---|---|
| All right | 343 | 42.9% |
| Neither | 45 | 5.6 |
| Not all right | 257 | 32.1 |
| Don't know | 110 | 13.8 |
| No answer | 45 | 5.6 |

13. Movie theaters and bookstores that restrict attendance to adults only to show depictions of S&M-type activities?

| | | |
|---|---|---|
| All right | 319 | 39.9% |
| Neither | 50 | 6.3 |
| Not all right | 272 | 34.0 |
| Don't know | 103 | 12.9 |
| No answer | 56 | 7.0" |

Also testifying on behalf of the defendant was Dr. Frank Cushing, a clinical psychologist with a doctorate in psychology. Dr. Cushing testified that the ranges of human sexual conduct which he observed in the materials on trial fell within the category of normal sexual activity and did not fall in the category of a shameful or morbid interest in sex. He further testifies that the bondage materials appealed to the fantasies and was not so much a sexual issue as a power and control issue. Finally, Dr. Cushing stated that the materials presented at trial had a limited value and that exposure to them would not lead the average adult to commit antisocial acts.

John Breen, a legal investigator, testified that he went to various adult bookstores in different communities throughout the State of Illinois where he purchased magazines portraying the bondage content and human sexual conduct which he observed available in the materials in those locations. He testified that he observed materials dealing with heterosexual intercourse, anal and oral intercourse, homosexual and lesbian activities, and bondage in the various bookstores. He also confirmed that he had gone to the Decatur store where the defendant was charged with selling the materials and had viewed signs both inside and outside requiring that a person be 18 years of age to enter.

The defendant's oral motion for a directed verdict at the close of all the evidence was denied.

During the jury instruction conference, the defendant objected to People's instruction No. 10, which was the definitional instruction of obscenity, and tendered defendant's instructions Nos. 3 and 4, which were alternate definitional instructions. The People's instruction was given and the defendant's instructions were refused. The defendant also objected to People's instructions Nos. 11 through 15 and tendered defendant's instruction Nos. 5, 7, 9, 11, and 13, seeking the benefit of the "special justification" affirmative defense provided in section 11–20(f)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 11–20(f)(2)). The court gave the People's instructions and refused the defendant's instructions.

After 2¼ hours of deliberation, the jury found the defendant guilty of obscenity on the five counts submitted to it (counts IV

through VIII). The defendant filed a timely post-trial motion which was denied.

At the sentencing hearing, the State presented no evidence in aggravation. A presentence report had been prepared and submitted by the Macon County Probation Office which showed no prior history of criminality and also indicated that the defendant was leaving her position at the adult bookstore.

In mitigation, the defendant presented a favorable letter from an individual by the name of Katie Pryor and also the testimony of Sheila Diane Evans. Evans testified that she had known the defendant for 14 years and had gone to school with her. She characterized Tammy McGeorge as a good student and indicated that Tammy had won a national merit award. She also stated that the defendant was a "caring, trustworthy, honest person," and that she also considered the defendant to be a responsible person. The defendant baby-sat for the children of Evans. Evans also testified that she had never known the defendant to be in trouble before and that she was a hard worker.

Sergeant First Class Larry Bolton testified in further mitigation on behalf of the defendant. Sgt. Bolton was the senior service member of the United States Army in Decatur and was responsible for recruiting in that area. He testified that he had known Tammy McGeorge since March of 1985 and that he had met her at the recruiting center when she was processing to go back into the Intelligence Branch of the United States Army. He stated that the defendant had been a police officer in the military for three years and had an outstanding record. He also testified that they had been working on the reenlistment quite extensively over the past several months and that Tammy McGeorge was going into the Intelligence Branch, which was a step above the military police corps. The military police corps duty was not available to prior service personnel. According to Sgt. Bolton, the defendant had top-secret clearance and continuation of that top-secret clearance was necessary for her to go into the Intelligence Branch. If the defendant were to have a conviction on her record, it would be very damaging and she possibly would not be able to retain her top-secret clearance. Sgt. Bolton also testified that the defendant had to be back on active duty by at least August 15, 1986, in order to remain in the same status as before. If the defendant were to be required to report back after her enlistment time, a problem would occur and he would be unable to process her. Whatever sentence was imposed needed to terminate before August 15, 1986. Finally, the sergeant testified that everything was ready for the defendant to go back into the military, except for resolution of this case.

The State, arguing that "sentencing in obscenity cases is a little different than other types of misdemeanors," asked for one year of probation, with the conditions that the defendant serve 30 days in the county jail and be fined $250 per count. Defense counsel, pointing to the defendant's lack of a prior criminal history, her excellent service record, the favorable comments about her, and the impending reentry into the armed forces, suggested a three-month period of court supervision, which would be terminated by August 12, 1986. The court rejected the request for court supervision and imposed one year's probation with the condition that the defendant spend the first 15 days in the Macon County jail. The defendant timely filed notice of appeal on May 12, 1986.

Defendant challenges the obscenity statute and the instructions given in this case on the basis that a constitutional infirmity exists because an objective standard as opposed to a contemporary community standard should be required in determining if allegedly obscene materials are "utterly without redeeming social value." An identical challenge to the Illinois obscenity statute was recently considered by the United States Supreme Court in *Pope v. Illinois* (1987), 481 U.S. ____, ____, 95 L. Ed. 2d 439, 445-47, 107 S. Ct. 1918, 1920-23, wherein the court stated:

"There is no suggestion in our cases that the question of the value of an allegedly obscene work is to be determined by reference to community standards. Indeed, our cases are to the contrary. ***

Just as the ideas a work represents need not obtain majority approval to merit protection, neither, insofar as the First Amendment is concerned, does the value of the work vary from community to community based on the degree of local acceptance it has won. The proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole. The instruction at issue in this case was therefore unconstitutional.

The question remains whether the convictions should be reversed outright or are subject to salvage if the erroneous instruction is found to be harmless error. Petitioners contend that the statute is invalid on its face and that the convictions must necessarily be reversed because, as we understand it, the State should not be allowed to preserve any conviction under a law that poses a threat to First Amendment values. But the

868

statute under which petitioners were convicted is no longer on the books; it has been repealed and replaced by a statute that does not call for the application of community standards to the value question. Facial invalidation of the repealed statute would not serve the purpose of preventing future prosecutions under a constitutionally defective standard. Cf., *e.g.*, *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 964-68, and n.13 (1984). And if we did facially invalidate the repealed statute and reverse petitioners' convictions, petitioners could still be retried under that statute, provided that the erroneous instruction was not repeated, because petitioners could not plausibly claim that the repealed statute failed to give them notice that the sale of obscene materials would be prosecuted. See *Dombrowski v. Pfister*, 380 U.S. 479, 491, n.7 (1965); *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 375, n.3 (1971). Under these circumstances, we see no reason to require a retrial if it can be said beyond a reasonable doubt that the jury's verdict in this case was not affected by the erroneous instruction.

\* \* \*

\*\*\* While it was error to instruct the juries to use a state community standard in considering the value question, if a reviewing court concludes that no rational juror, if properly instructed, could find value in the magazines, the convictions should stand.

Although we plainly have the authority to decide whether, on the facts of a given case, a constitutional error was harmless under the standard of *Chapman v. California*, 386 U.S. 18 (1967), we do so sparingly. *Rose v. Clark, supra*, at ___. In this case the Illinois Court of Appeals has not considered the harmless-error issue. We therefore vacate its judgment and remand so that it may do so."

Thus, pursuant to the United States Supreme Court's decision in *Pope v. Illinois* (1987), 481 U.S. ___, 95 L. Ed. 2d 439, 107 S. Ct. 1918, we must determine if any rational juror, if properly instructed to apply an objective, "reasonable person" standard to the third prong of the tripartite test set forth in *Miller v. California* (1973), 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607, which requires the trier of fact to determine "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value," could find value in the materials upon which defendant's convictions were based.

In the instant case, Dr. Frank Cushing, a clinical psychologist

with a doctorate in psychology, testifies on behalf of defendant regarding the value of the materials in question. During his testimony, the following colloquy ensued:

"Q. Now, from a clinical psychologist's viewpoint, do you have an opinion, based upon a reasonable degree of professional certainty, about whether these materials that you have reviewed here that are on trial have any value?

A. They are of limited value.

Q. And what kind of value or limited value do they have?

A. I think depending on the specifics, the value has—the value issue has two parts.

On one hand, there is an attempt by some individuals in marriage to achieve a marital balance between their sexual drive and the sexual drive of their spouse.

For example, someone who would fantasize towards some of that kind of behavior, that might make their spouse very uncomfortable with that fantasy. Rather than try to impose that kind of an activity or lifestyle on their spouse, they might read about it and try to vicariously take care of the fantasy that way.

There is also much in literature that suggests what we call a safety valve theory that some people who are maybe less well adjusted than the norm might tend to use materials like this to satiate their own need for some kind of a physical sexual contact.

Again, utilizing these materials, it might make them less likely, and once I suggested inhibits the aggressive tendency later on."

The State presented no evidence regarding the materials' value or lack of value.

■ Based on the evidence in the record now before us, we cannot conclude beyond a reasonable doubt that the jury's verdict in this case was not affected by the erroneous instruction. Instructing the jury to determine the value issue based on community standards may well have prompted the jury to disregard or discount Dr. Cushing's testimony that the material had some value. The jury could have determined, based on the erroneous instruction, that although the materials had some value in the opinion of the scientific community, they nevertheless had no value to the community which the jury represented. Pursuant to the United States Supreme Court's decision in *Pope v. Illinois* (1987), 481 U.S. ___, 95 L. Ed. 2d 439, 107 S. Ct. 1918, we cannot uphold an obscenity conviction in which the jury was

instructed to consider the value question based on community standards unless we can conclude that no rational juror, if properly instructed, could find value in the materials. We believe that a rational juror, if properly instructed, could have accepted Dr. Cushing's testimony and concluded that the materials in question had some limited value, either as an aid in achieving marital balance, or as a safety valve to prevent criminal behavior. Consequently, we conclude that the erroneous instruction was not merely harmless error and that this cause must be remanded for a new trial.

Defendant also argues that the affirmative defenses provided under the Illinois obscenity statute deny her equal protection of the law and are void for vagueness.

Subsection (f) of the Illinois obscenity statute (Ill. Rev. Stat. 1983, ch. 38, par. 11—20(f)) provides affirmative defenses under certain circumstances:

"(f) Affirmative Defenses.

It shall be an affirmative defense to obscenity that the dissemination:

(1) Was not for gain and was made to personal associates other than children under 18 years of age;

(2) Was to institutions or individuals having scientific or other special justification for possession of such material."

The defendant submits that subsection (f)(2) of the obscenity statute (Ill. Rev. Stat. 1983, ch. 38, par. 11—20(f)(2)) in particular denies her equal protection of the law and is unconstitutionally vague.

After a thorough review of the entire record in this case, we conclude that defendant has waived her right to challenge the validity of the Illinois obscenity statute based upon her arguments relating to the affirmative defense provisions. (Ill. Rev. Stat. 1983, ch. 38, par. 11—20(f).) The only mention of subsection (f)(2) of the Illinois obscenity statute (Ill. Rev. Stat. 1983, ch. 38, par. 11—20(f)(2)) in defendant's motion to dismiss is that the statute is unconstitutional because:

"(iii) It fails to allow an affirmative defense for a dissemination to all adults instead of certain special classifications of persons (ch. 38, par. 11—20(f)(2)). *People v. Wrench*, 83 Misc. 2d 95, 371 N.Y.S. 2d 833 (1975)."

During extensive oral argument on defendant's motion to dismiss, defense counsel made absolutely no mention of any infirmity in the affirmative defense provisions of the Illinois obscenity statute. Ill. Rev. Stat. 1983, ch. 38, par. 11—20(f).

In arguing for a directed verdict at the close of the State's evidence, defense counsel briefly mentioned that if the court did not ap-

ply the affirmative defense in this case "I believe we have significant equal protection problems with that provision of the Illinois Revised Statutes." Defense counsel did not explain what these "significant *** problems" were, nor did he cite any authority or offer any argument in support of this statement. In arguing for a directed verdict at the close of all of the evidence, defense counsel again briefly mentioned a potential equal-protection problem, but again failed to further argue the issue or offer any authority in support of his statement.

At the instruction conference, defense counsel again mentioned a potential equal-protection problem; however, no cogent argument or citation of authority was given at that time.

In defendant's post-trial motion, no specific points or arguments were raised relating to the unconstitutionality of these "affirmative defense" provisions. (Ill. Rev. Stat. 1983, ch. 38, par. 11—20(f).) Likewise, the notice of appeal is silent regarding these issues. On appeal, defendant now raises complicated constitutional challenges to the Illinois obscenity statute based upon arguments attacking subsection (f)(2) of that statute on the basis of equal protection and vagueness principles.

It is apparent that the trial court did not have the benefit of hearing and considering the arguments raised by defendant on appeal regarding this issue. During the entire proceedings, defense counsel never even mentioned that there might be a "vagueness" problem with subsection (f)(2) of the obscenity statute (Ill. Rev. Stat. 1983, ch. 38, par. 11—20(f)(2)). The simple citation of a New York case, which has limited precedential value in either the circuit court or this court (see *People v. Pope* (1985), 138 Ill. App. 3d 726, 735-36, 486 N.E.2d 350, 355; *Ladd Construction Co. v. Insurance Co. of North America* (1979), 73 Ill. App. 3d 43, 47, 391 N.E.2d 568, 571-72) without any explanation or argument, other than a brief mention of an "equal protection problem," does not properly preserve the issues now raised by defendant for our review.

It is well settled that issues raised for the first time on appeal normally may not be considered by an appellate court or be argued on appeal. (*Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 303, 443 N.E.2d 575, 577; *J. R. Sinnott Carpentry, Inc. v. Phillips* (1982), 110 Ill. App. 3d 632, 639, 443 N.E.2d 597, 603.) Additionally, constitutional issues not pertaining to jurisdiction of the court cannot be argued on appeal unless first raised and preserved in the trial court. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Amerman* (1971), 50 Ill. 2d 196, 279 N.E.2d 353.) Furthermore, specificity in a post-trial motion is required to preserve issues

872

for review. *Wilson v. Clark* (1981), 84 Ill. 2d 186, 189, 417 N.E.2d 1322, 1324; *Brown v. Decatur Memorial Hospital* (1980), 83 Ill. 2d 344, 415 N.E.2d 337.

■■ As this court stated in *Kaiser Agricultural Chemicals v. Rice* (1985), 138 Ill. App. 3d 706, 715, 486 N.E.2d 417, 424, failure to specify a matter as error in a post-trial motion and failure to raise such matter as an issue in the notice of appeal constitutes waiver. Furthermore, an argument which is raised explicitly for the first time on review is deemed waived. *Grover v. Commonwealth Plaza Condominium Association* (1979), 76 Ill. App. 3d 500, 507, 394 N.E.2d 1273, 1278.

Under these circumstances, we conclude that defendant has waived her right to challenge the constitutionality of the Illinois obscenity statute in the instant appeal based on the arguments she now raises relating to the affirmative defense provisions contained in that statute. (Ill. Rev. Stat. 1983, ch. 38, par. 11—20(f).) This would not preclude the raising of this issue in a subsequent trial.

■■ Defendant next argues that she was not proved guilty beyond a reasonable doubt because no evidence was presented by the State relative to the essential element of contemporary community standards as they pertain to prurient interest and patent offensiveness. This argument is clearly without merit. As defendant herself points out, numerous United States Supreme Court cases have recognized the principle that the State need not present expert affirmative evidence in an obscenity prosecution when the materials themselves are placed into evidence. *Smith v. United States* (1977), 431 U.S. 291, 52 L. Ed. 2d 324, 97 S. Ct. 1756; *Hamling v. United States* (1974), 418 U.S. 87, 41 L. Ed. 2d 590, 94 S. Ct. 2887; *Paris Adult Theatre I v. Slaton* (1973), 413 U.S. 49, 37 L. Ed. 2d 446, 93 S. Ct. 2628; *Kaplan v. California* (1973), 413 U.S. 115, 37 L. Ed. 2d 492, 93 S. Ct. 2680; *Jenkins v. Georgia* (1974), 418 U.S. 153, 41 L. Ed. 2d 642, 94 S. Ct. 2750.

Defendant acknowledges the foregoing rule of law, but argues that the United States Supreme Court has yet to consider the effect its decisions in *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068, and *Mullaney v. Wilbur* (1975), 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881, may have on the continued viability of the aforementioned principle.

We note that *Smith*, which reaffirmed the aforementioned principle, was decided in 1977, whereas *Mullaney* was decided in 1975, and *Winship* was decided in 1970. The United States Supreme Court was obviously aware of its decisions in *Mullaney* and *Winship* when it de-

cided *Smith*.

On the merits, we fail to see how *Mullaney* or *Winship* offer any support for defendant's argument on this issue. In *Winship*, the court held that the due process clause protected the accused against conviction except upon proof beyond a reasonable doubt of every element of the crime with which the accused is charged. In *Mullaney* the Supreme Court, relying upon *Winship*, held that under the Maine law of homicide, the State could not constitutionally place upon the defendant the burden of proving by a preponderance of the evidence that the killing occurred upon provocation, where a lack of provocation was a specific element of the homicide statute.

■ The instant case is clearly distinguishable from *Winship* and *Mullaney*. *Mullaney* and *Winship* require the State to prove every element of a crime beyond a reasonable doubt; however, it is well settled that proof of the contemporary standard is not a necessary element to constitute the crime of obscenity; rather, it is a standard against which prurient interest, patent offensiveness, and social value are measured. (*Smith v. United States* (1977), 431 U.S. 291, 52 L. Ed. 2d 324, 97 S. Ct. 1756.) We conclude that there is no merit to defendant's argument that the State is required to present evidence of contemporary community standards.

■ Defendant next argues that she was not proved guilty beyond a reasonable doubt because the evidence failed to establish *scienter* or knowledge on her part. Defendant relies principally on *People v. Hart* (1981), 101 Ill. App. 3d 343, 427 N.E.2d 1352. In *Hart*, the court found that the State failed to prove the element of knowledge. There, a police officer asked the clerk for $5 in the form of quarters and walked to a projection area 30 feet from the clerk's counter. After using the money to watch films and then browsing through the store, the officer asked if any of the movies viewed were for sale, the clerk responded that she did not know, but stated that some of the other films might be for sale. The court found the evidence of *scienter* insufficient, stating that such a conclusion would result in declaring that all materials contained in an adult bookstore were *per se* obscene and all persons working there were *per se* guilty of obscenity.

The instant case is distinguishable from *Hart*. Decatur police officer Clifford Kretsinger testified that on October 28, 1985, he entered an adult bookstore located in a business area in Decatur, Illinois. As he entered the store, the defendant issued the officer a receipt for the browsing fee. The officer picked up the book She-Male Sadist, opened it to an illustration of a woman being sexually tortured, and asked the defendant if there were any books with pictures similar to the illustra-

tion. The officer purchased the above book, together with the magazines Slave Sisters, Chair Bondage, and Climax by Pain. The price of each magazine ranged between $5 and $7. On cross-examination, Kretsinger testified that he was aware that the purchases were made from an adult bookstore, as it was labeled so outside.

Decatur police officer David Barringer testified that on the day in question he also entered the same adult bookstore. He picked up the book Master of Pain, opened it to a picture of a woman being sexually tortured, and asked the defendant if there were any films depicting this activity. The defendant responded there were none of that nature currently, but she stated that there were magazines portraying such activity, and she pointed toward the bondage magazines. Together with the above-mentioned book, the officer also took the book Daughters of Darkness and the magazines John Savage's Notebook and Asses in Bondage. He placed the items on the counter, the books costing $3.95 each and the magazines $7 each. He gave the purchase money to the defendant, and she placed the materials in a bag. None of the illustrations on the covers of the materials were covered.

We believe the instant case is factually indistinguishable from *People v. Pope* (1985), 138 Ill. App. 3d 726, 486 N.E.2d 350, and *People v. Patroff* (1986), 141 Ill. App. 3d 483, 490 N.E.2d 148, both of which upheld obscenity convictions against employees of adult bookstores under similar circumstances. As the court stated in *Pope*:

> "In the instant case, it would stretch this court's imagination to believe that defendant did not know or should not have known of the contents of the three magazines that he sold to the officer. *** It is well settled in Illinois that even casual examination of an obscene magazine cover is sufficient to establish a violation of the obscenity statute. (*People v. Moore* (1977), 53 Ill. App. 3d 75, 77, 368 N.E.2d 586; *People v. Doto* (1977), 53 Ill. App. 3d 62, 66, 368 N.E.2d 577; *People v. Glass* (1976), 41 Ill. App. 3d 43, 47, 353 N.E.2d 214.) Regardless of defendant's contention, that he was new at the book store, we find it difficult to believe that defendant would not be fully apprised of the type and character of the three magazines simply by looking at them. Additionally, the high price charged for the publications as well as the fact that a 50 [cents] browsing fee was charged as admission are indicative that defendant possessed the necessary *scienter*." (*People v. Pope* (1985), 138 Ill. App. 3d 726, 742, 486 N.E.2d 350, 360.)

Furthermore, as the court stated in *Patroff*:

> "This evidence was sufficient, if believed by the jury, to find

that defendant knowingly offered obscene magazines for sale. These factors are indicative of the requisite *scienter*. (See *People v. Pope* (1985), 138 Ill. App. 3d 726, 742.) It is beyond reason that defendant did not know or have reason to know the nature or content of the magazines in question. Since even casual examination of an obscene magazine cover is sufficient to establish a violation of the obscenity statute (138 Ill. App. 3d 726, 742), we conclude the State provided adequate proof that defendant knowingly offered obscene magazines for sale." *People v. Patroff* (1986), 141 Ill. App. 3d 483, 490-91, 490 N.E.2d 148, 153.

Each count in the information in this case alleged that the defendant had knowledge of the nature of the contents of the materials or recklessly failed to exercise reasonable inspection which would have disclosed the nature or content of the materials. The front and back covers of all of the magazines involved in this case consist of graphic illustrations of obscenity. None of these illustrations were concealed. Furthermore, the evidence adduced at trial revealed that defendant was shown illustrations in the books, that she identified the depictions as bondage, that she told Officer Barringer that bondage magazines were available, and that she directed the officer to the location of these materials within the store where she was employed. The totality of these circumstances clearly warranted a finding that the defendant had knowledge of the contents of the materials. *People v. Patroff* (1986), 141 Ill. App. 3d 483, 490 N.E.2d 148; *People v. Pope* (1985), 138 Ill. App. 3d 726, 486 N.E.2d 350.

■ ■ Defendant next argues that the State failed to prove her guilty beyond a reasonable doubt on count IV because the State's evidence failed to establish possession with the intent to disseminate the book She-Male Sadist. We agree. Defendant never had actual physical possession of the book. The evidence showed no proprietary or possessory interest in the bookstore on the part of defendant. The sale of the book which was the subject of count IV was made by another employee. The fact that defendant made a sale at the same store several hours later does not prove beyond a reasonable doubt that she ever possessed the book in question. As this court stated in *People v. McNeely* (1981), 99 Ill. App. 3d 1021, 1024, 426 N.E.2d 296, 298:

"For constructive possession to be proved, the accused must, at least, be shown to have exclusive control of the area of the premises where the items illegally possessed were situated. (*People v. Mack* (1957), 12 Ill. 2d 151, 145 N.E.2d 609.)"

We conclude that the State failed to prove beyond a reasonable doubt

that defendant possessed the book She-Male Sadist with intent to disseminate.

■■■ Defendant next argues that the jury failed to perform its duty to examine each of the materials as a whole, as required by statute (Ill. Rev. Stat. 1983, ch. 38, par. 11—20(b)) and relevant case law. (*Miller v. California* (1973), 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607.) Defendant notes that this case involved three 170-page books and two magazines which were between 45 and 50 pages in length, and that the jury returned a verdict in two hours and fifteen minutes. Defendant cites *Bryers v. State* (Tex. Crim. App. 1972), 480 S.W.2d 712, and *United States v. West Coast News Co.* (W.D. Mich 1964) 228 F. Supp. 171. *aff'd.* (6th Cir. 1966), 357 F.2d 855, *rev'd on other grounds* (1967), 388 U.S. 447, 18 L. Ed. 2d 1309, 87 S. Ct. 2095, in support of her argument that the materials must be read from beginning to end. Neither of these cases are binding on this court, and we refuse to impose such a restrictive standard. The text of the books was uncomplicated, and the magazines were primarily pictorial in nature. We believe that under these particular circumstances, the nature of the materials "as a whole" could be ascertained by the jury in the time it spent deliberating. We note also that the jury was allowed to view the materials for an unspecified time during the course of the trial. Under different circumstances, at least two Illinois courts have held that determination of reasonable length of time for jury deliberations is grounded in the discretion of the trial court. (*People v. Wurster* (1980), 83 Ill. App. 3d 399, 403 N.E.2d 1306; *People v. Allen* (1977), 47 Ill. App. 3d 900, 365 N.E.2d 460.) Although these two cases are factually distinguishable from the instant case, we believe the general rule of law extracted from these cases is sound and choose to follow this principle. Accordingly, we conclude that under these specific circumstances, the duration of the jury's deliberations was not unreasonable.

Defendant next argues that the materials which are the subject of her conviction are not obscene as a matter of law. This contention is clearly without merit. A brief analysis of each of the materials in issue reveals the following: The magazine John Savage's Notebook contains pictures of scantily clad women who are blindfolded, gagged, and tied in complex and obviously uncomfortable bondage positions using large amounts of rope. Some of the textual material told of lesbians engaging in fondling and oral sex. The magazine Asses in Bondage contains pictures of scantily clad models with focus on the genitals, including focus on a vibrator placed near the vagina. Textual references are made to anal intercourse, intercourse with dildos, and

satisfaction from the pain of rope burns. The three books deal with subjects ranging from sexual torture with machines, uses of alligator clips and pins inserted on the breast, anal intercourse, oral sex, beating, rape, incest, and the use of enemas.

■■■ These materials are similar in nature to those which were involved in *People v. Anderson* (1985), 130 Ill. App. 3d 318, 473 N.E.2d 1245. The *Anderson* court determined that these "bondage" materials were properly classified as sadomasochistic and held that these materials could properly be determined to be obscene. As the court stated in *Anderson*:

> "Pictures in [the] magazines in the case at bar show women in pain caused by rope knots and wooden and metal clamp-like devices placed on the women's breasts, lips, and vaginas. In other cases, women are tied in uncomfortable position, ***. These pictures constitute sufficient representations of violence and brutality to warrant a finding of obscenity ***." (130 Ill. App. 3d 318, 326, 473 N.E.2d 1345, 1350.)

We find no valid distinction between *Anderson* and the instant case.

The material in the case at bar consisted of representations of ultimate sex acts and lewd exhibition of the genitals, both of which are proscribed by the relevant statute. (Ill. Rev. Stat. 1983, ch. 38, par. 11—20.) Sexual violence and brutality were also described and depicted. Such descriptions have been held to be obscene as a matter of law. (*People v. Anderson* (1985), 130 Ill. App. 3d 318, 473 N.E.2d 1345.) Consequently, we choose to follow *Anderson,* and conclude that defendant's argument that the materials involved in this case are not obscene as a matter of law is without merit.

■■ ■ Defendant's final argument is that the trial court abused its discretion in denying her court supervision and in sentencing her to a term of probation conditioned upon 15 days of imprisonment.

The presentence report showed that the defendant had no prior history of delinquency or criminality. It also showed that the defendant had resigned her employment at the adult bookstore and was attending classes at Richland Community College. Further, defendant served in the military from 1981 to 1984, received an honorable discharge, and had top-secret clearance with the United States Army.

At the sentencing hearing held on May 9, 1986, the State presented no evidence in aggravation. In mitigation, a favorable letter from Katie Pryor was submitted and Sheila Diane Evans testified about various positive attributes of the defendant, including her honesty, trustworthiness, responsibility and hard-working nature.

A local Army recruiter, Sgt. Larry Bolton, established that

defendant had an outstanding service record in the military police and informed the court about the defendant's planned reenlistment in the Intelligence Branch of the Army, a process which had begun before her arrest in this case. In order for the defendant to keep her top-secret clearance, as well as her current status, it was important that the defendant have no conviction, complete her sentence by August 15, 1986, and reenter the service by that date.

In addressing sentencing alternatives, the State's Attorney argued that "sentencing in obscenity cases is a little different than other types of misdemeanors." The trial court denied the defendant's request for court supervision and sentenced the defendant to one year of probation, conditioned on serving the first 15 days in the Macon County jail and the payment of costs. In passing sentence, the trial court judge made the following comments:

> "This case is not just like the simple case of a person, perhaps, being involved in a tavern brawl in which two people have a little bit too much to drink and they get upset with each other and the Court ends up giving that type of supervision. This case was a case in which this young lady worked in a bookstore, knew or probably had reason to know that some of the material was obscene or borderline obscene and indicated this when the officer went in when she said 'Are you a police officer,' and he said 'No. What would happen if I were?' and she said, 'You wouldn't get the material.'
>
> She was working there and making a profitable gain, her income, knowing this material was the type of material that would not be allowed or probably would not be allowed by the jury in this particular county or the courts in this county. These materials are not borderline type of materials. I think they are fairly blatant in reading the appellate court cases in that they fit under the bondage type materials. I don't see how counsel can stand there with a straight face and say that these materials can be of any social redeeming value—typing [sic] people up, sticking clothespins on their breasts is repulsive."

The trial judge's comments were improper in two respects.

First, by his comments, the judge created a class of disfavored offenders, that class being those persons who work in adult bookstores. The trial court judge's actions in this case were very similar to the action of the trial court judge in *People v. Bolyard* (1975), 61 Ill. 2d 583, 338 N.E.2d 168. In that case, the judge made comments indicating that sex offenders as a class would not be considered for probation. The Illinois Supreme Court held that the trial judge had arbitrar-

ily denied probation because the defendant fell within his category of disfavored offenders. It vacated the sentence and remanded the cause for resentencing in front of another judge. Second, the trial court judge acted directly contrary to the principles enunciated in *People v. Hart* (1981), 101 Ill. App. 3d 343, 427 N.E.2d 1352, and *People v. Pope* (1985), 138 Ill. App. 3d 726, 486 N.E.2d 350. In *Hart*, the appellate court specifically stated that it was improper for the trial court to take into consideration the fact that the defendant was paid to work in an adult bookstore. It stated that it would have vacated the sentence and remanded for resentencing had it not reversed the conviction on other grounds.

In *Pope*, the trial court's statements indicated that it had denied consideration of probation or conditional discharge because the defendant continued to be employed in the adult bookstore. Citing *Hart*, the Second District Appellate Court vacated the sentence and remanded for resentencing.

The State, citing *People v. Bourke* (1983), 96 Ill. 2d 327, 449 N.E. 2d 1338, argues that "given the tone of the court's pronouncement and its determination that the gravity of the offense was severe, any error made in reference to the defendant's employment was harmless." As defendant points out, the Illinois Supreme Court in *Bourke* outlined the law relating to the consideration of an improper factor at sentencing:

"It is clear from the decisions of this court and the appellate court that reliance on an improper factor in aggravation does not always necessitate remandment for resentencing. Where the reviewing court is unable to determine the weight given to an improperly considered factor, the cause must be remanded for resentencing. (*People v. Conover* (1981), 84 Ill. 2d 400, 405; *People v. Gardner* (1982), 105 Ill. App. 3d 103, 118; *People v. Teague* (1981), 101 Ill. App. 3d 993, 996; *People v. Hart* (1981), 101 Ill. App. 3d 343, 344; *People v. Allen* (1981), 97 Ill. App. 3d 38, 40.) However, where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required. *People v. Reid* (1983), 94 Ill. 2d 88, 91; *People v. DeSimone* (1982), 108 Ill. App. 3d 1015, 1019; *People v. Carmack* (1982), 103 Ill. App. 3d 1027, 1037-38; *People v. Hicks* (1981), 101 Ill. App. 3d 238, 244; *People v. Devine* (1981), 98 Ill. App. 3d 914, 926-27; *People v. Fowler* (1981), 98 Ill. App. 3d 202, 206-07." 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340.

The court in *Bourke* decided that, based on other comments by the trial court, it was able to determine that the length of the defendant's sentence was not increased by the trial court's statement that the defendant had received compensation for committing the offenses.

The instant case is clearly distinguishable from *Bourke*. In the instant case, the trial court relied on two improper factors in his brief comments upon sentencing the defendant. Under these circumstances, we are unable to determine the weight given to the improperly considered factors. Consequently, we would be compelled to remand this case for resentencing before another judge if we were not reversing defendant's conviction on other grounds.

For the reasons stated herein, the judgment of the circuit court is reversed; the sentence imposed by the circuit court is hereby vacated; and the cause is remanded for a new trial on counts V through VIII.

Reversed, sentence vacated, and cause remanded for new trial.

LUND and KNECHT, JJ., concur.